## Ben T. Hosking, Defendant in Error, v. Southern Pacific Company, Plaintiff in Error.

### Gen. No. 14,402.

1. MUNICIPAL COURT—*how long jurisdiction continues.* If a motion to set aside a judgment is made in the Municipal Court in due time, the jurisdiction of such court over such judgment continues until the motion to set aside has been disposed of and until the disposition of the motion the time for the taking of an appeal or the suing out of a writ of error does not run.

2. COMMON CARRIERS—*when liability as to baggage attaches.* Responsibility of a common carrier begins with the actual delivery by the owner of the property involved. A baggage check is but a receipt and as such it is not conclusive upon the carrier. The possession of a baggage check or receipt is only *prima facie* evidence that an article in question has actually come into the hands or control of the carrier. The carrier may rebut this *prima facie* proof

or it may appear from the evidence adduced by the plaintiff, when considered altogether, that the check or receipt was obtained by him without the article in question actually passing into the hands of the carrier. Proof, however conclusive, of constructive possession in the carrier, does not satisfy the requirements of the law in such case. The delivery of a trunk to a common carrier for carriage is not complete while the trunk remains in the traveler's private dwelling, although a check or receipt therefor may have been issued by the carrier.

Tort. Error to the Municipal Court of Chicago; the Hon. WILLIAM N. COTTRELL, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1908. Reversed. Opinion filed March 26, 1909. Rehearing denied April 2, 1909.

**Statement by the Court.** Ben T. Hosking, defendant in error, brought suit in the Municipal Court against the Southern Pacific Company, a common carrier, to recover the value of a lost trunk and contents. A trial, without a jury, was had and a judgment rendered against the Southern Pacific for $997.50 and costs. The writ of error now before us was sued out by the company to reverse that judgment.

Mr. Hosking and his wife were traveling in California upon round-trip tickets from Chicago and had two trunks with them. They were in San Francisco, at the St. Francis Hotel, on and prior to April 18, 1906, the day of the earthquake in that city. Their plan was to leave San Francisco for Salt Lake City on that day and, accordingly, they had secured accommodations upon the train which left at 9 o'clock in the morning on the Southern Pacific Railway. The earthquake, however, occurred at 5:15 o'clock in the morning, and Mr. Hosking and his wife were thereby delayed so that they did not leave until on the 19th, the day following. The conflagration in San Francisco, which accompanied the earthquake, reached and destroyed the St. Francis Hotel the morning of the 19th of April.

When Hosking and his wife first arrived in San Francisco they sent one of the two trunks to the

Union Transfer Company's office and the other to the St. Francis Hotel. The Union Transfer Company was engaged in the business of transferring baggage in the city of San Francisco and it maintained an office in the hotel. One C. M. White was in charge as checking agent for the Transfer Company at the office in the hotel. White, being called on behalf of Hosking, testified that, as such agent, he handled all baggage transferred in or out of the hotel by the Union Transfer Company and issued checks therefor. In preparation for leaving San Francisco, Hosking went to the hotel clerk to get his baggage attended to. The clerk referred him to the "checker", meaning White, and with him Hosking made his arrangements. According to Hosking, who is very positive, this was about eight o'clock on the morning of the earthquake, the 18th, but according to White it was in the evening of the 17th of April. It is not very material which is correct, but Hosking is probably right. When Hosking spoke to White, one of the trunks still remained in charge of the Transfer Company and was either at its office or at a terminal or ferry station, and the other was in Hosking's room in the hotel. He gave the checking agent a transfer check which he had, showed him his railroad tickets and received, as he says, "two checks for two trunks; one was, I suppose, at the terminal or the ferry and the other was in St. Francis Hotel." The one of the checks then handed Hosking, which we are now concerned with, is as follows:

"CARD SPECIAL.....................Form 807.
Southern Pacific
      Company.                         DUPLICATE.
                                            State.
To Salt Lake              Ogden        Junction
Via Rio Grande          65101E       point.
        (printed on back thereof)
           NOTICE TO PASSENGERS.
To avoid paying storage charges, baggage should be claimed immediately upon arrival at destination.

Passengers should take memorandum of the numbers of their baggage checks. In the event of duplicate checks being lost, such information will facilitate the obtaining of delivery at destination.

No single piece of baggage weighing more than 250 pounds will be forwarded.''

The trunk not at the hotel was subsequently searched for, discovered and, about four months later, delivered to Hosking by the Southern Pacific Company and, therefore, it is not now involved in this controversy. The trunk which was at the hotel is the one for the value of which and its contents this suit is brought. So far as this record shows, that has not been seen or heard of since Hosking saw it in his room that morning. Hosking, at about 8 o'clock on the morning of the earthquake, asked the checking agent if the baggage would be down from his room and the checking agent said it would. About 9 o'clock in the morning of the 18th Hosking and his wife left the hotel and of their movements on that day or the next the record discloses nothing, except that they left San Francisco for Salt Lake City on the train the morning of the 19th. The evidence shows that on the day of the earthquake the elevators in St. Francis Hotel were not running and that no trunk or baggage was permitted to be carried down the stairways; but, otherwise, the hotel was open and doing business.

When Hosking arrived at Salt Lake City and also when he arrived home in Chicago, he made demands for his trunks. There was some correspondence between him and the Southern Pacific in relation to the matter. The letter of earliest date introduced in evidence, which covers the material part of the correspondence, is as follows:

"SOUTHERN PACIFIC COMPANY.
In reply, refer to No. 7931.
E. B. CARSON, General Baggage Agent,
  Office, New Ferry Depot, Foot of Market St.,
  San Francisco, September 4, 1906.
MR. B. T. HOSKING,
  14 & 16 River Street, Chicago.
DEAR SIR:—
Under date of August 29th Mr. Taylor writes me
advising delivery to you of one of your trunks you
had in San Francisco at time of the recent disaster.

Owing to destructions of all records the Union
Transfer Company who were handling your baggage
were unable to give us any information.

In making search for various pieces of baggage miss-
ing, we came across this trunk and believing it to be
one of your pieces, forwarded it accordingly and I
am very glad it turned out to be your property.

This trunk, it seems, was the one you left with the
Union Transfer Company and instead of being placed
in their office was brought to the Ferry baggage room,
hence not destroyed.

So far as I have been able to learn relative to the
second piece which you had at the Hotel, this was in
the hotel the night of April 17th and as everything
in the St. Francis Hotel was destroyed there is every
reason to believe that the missing trunk was also
burned.

Should I find anything whatever, I would be only
too glad to advise you accordingly.
                    Yours truly,
                              E. B. CARSON."
There is no material conflict in the evidence.

JOHN MAYNARD HARLAN and M. C. MCGIFFIN, for
plaintiff in error.

SHERIFF, DENT, DOBYNS & FREEMAN, for defendant
in error.

MR. JUSTICE CHYTRAUS delivered the opinion of the court.

Defendant in error raises the objection that this court has no jurisdiction to entertain this writ of error. The objection is based upon the procedure in the court below. The judgment complained of was rendered and entered of record on December 24, 1907. At that time plaintiff in error made an oral motion for a new trial which was overruled and, after such ruling, a motion in arrest of judgment, which was also overruled. On January 18, 1908, plaintiff in error filed a written motion as follows:

"Now comes the defendant, by its attorney, John Maynard Harlan, and moves the court to set aside its findings and judgment heretofore rendered and to grant a new trial in said cause for the following reasons, to-wit:"

Certain specified grounds were assigned, following the motion. The court recognized and entertained this motion and ordered it continued and set to be heard on February 1, 1908. On that date the court again ordered the hearing upon the motion continued and set it to be heard on February 8, 1908. Then, on February 8, 1908, the court overruled the motion. When the motion was overruled the court granted plaintiff in error thirty days in which to file its stay of execution bond and to present its bill of exceptions. On February 17, 1908, plaintiff in error presented its stay of execution bond which was duly approved by the court and, on the same day, the plaintiff in error sued out of this court this writ of error. The writ of error was not sued out of this court until more than thirty days after the judgment was rendered and entered of record, but within thirty days after the motion to set aside the findings and judgment was disposed of. This was too late, it is contended, to permit this court to take jurisdiction. If, in contemplation of law, there was a finality, on December 24,

1907, to the judgment then rendered and entered, this court is without jurisdiction to review that judgment. But, was that judgment a finality on that day?

By the Municipal Court Act, in Section 19, it is provided the practice in the Municipal Court, in so far as we are at present concerned, shall be the same as that which at the passage of the act was prescribed by law for similar suits or proceedings in the Circuit Courts.

Section 21 of said act provides:

"That there shall be no stated terms of the Municipal Court, but said court shall be always open for the transaction of business. Every judgment * * * of said court, final in its nature, shall, for the period of thirty days after the entry thereof, be subject to be vacated, set aside or modified, in the same manner and to the same extent as a judgment * * * of a Circuit Court during the term at which the same was rendered in such Circuit Court." And then follows a provision that after the lapse of thirty days such judgment shall not be vacated.

Section 23 of the act provides that the final orders and judgments of that court, of the fourth class, shall be reviewed by writ of error only and that "The time within which a writ of error may be sued out in any such case shall be limited to thirty days after the entry of the final order or judgment complained of."

Thus, by the act establishing the court, stated terms are not created but a thirty day period, after the rendition of every judgment final in its nature, is provided for, which takes the place of the period remaining of the judgment term after the rendition of a judgment in the Circuit Court. The practice in regard to vacating, setting aside or modifying judgments shall be the same as in the Circuit Courts. Whatever the effect may be, as regards the finality of the judgment, of a motion made in a Circuit Court, during the judgment term, to set aside a judgment and for a new trial, that is the effect of the motion made

in the court below, on January 18, 1908, upon the judgment of December 24, 1907. The court had the power either to entertain or refuse to entertain the motion. After it was entertained, the court below was no more obliged to dispose of it within the thirty days than a Circuit Court is obliged, under the law, to dispose of a like motion within the term when made. When the court entertained the motion and took it under consideration for argument or otherwise, the court obtained such absolute power over the judgment that it was thereafter *in fieri* and not final. It was thereafter final only in form, not in substance. The record of the court was thereafter open and the entire matter was thereafter *sub judice* in the fullest sense; and it remained under judicial consideration and undetermined until the court, on February 8, 1908, disposed of the motion to set aside and for a new trial. It is settled as the law of this state that when such motion has been made at the same term at which a judgment has been rendered the judgment remains under judicial consideration and the court has full power over that judgment at subsequent terms, precisely the same as during the judgment term. Hibbard v. Mueller, 86 Ill. 256; Windett v. Hamilton, 52 Ill. 180; Watson v. Le Grand R. S. R. Co., 177 Ill. 203. In People v. Gary, 105 Ill. 264, the question arose whether a judgment rendered became final at the December term 1879 or on February 2, 1880. It appears the case was tried, upon default, on December 17, 1879, and a judgment was rendered against defendant on that day. On December 24 following, at the same term of court, defendant appeared and entered a motion to vacate and for a new trial. This motion was continued from time to time by the court until February 2, 1880, and then overruled. The Supreme Court there held "the legal effect of the motion for a new trial, when regularly continued, was to stay final judgment until the motion was overruled", and that the judgment entered did not become final

until February 2, 1880. In Hearson v. Graudine, 87 Ill. 115, the question arose as to the effect of a motion, made in apt time, for a new trial upon a judgment entered at a former term—whether it stayed the finality thereof. The Supreme Court there held: "There could be no 'final judgment' in the technical sense, until that motion was determined." The precise question now before us was settled, adversely to the contention of defendant in error, in Kingman v. Western Mfg. Co., 170 U. S. 675. The syllabus correctly states the decision in that case as follows: "A judgment is not final, so that the jurisdiction of the Appellate Court may be invoked, while it is still under the control of the trial court, through the pendency of a motion for a new trial." The same rule has frequently been announced by the federal courts upon interpositions of petitions for rehearing and otherwise. Brockett v. Brockett, 2 How. (U. S.) 238; Northern Pacific R. R. Co. v. Holmes, 155 U. S. 137; Aspen M. & S. Co. v. Billings, 150 U. S. 31; Clarke v. Eureka Co. Bank, 131 Fed. 146. We hold that, after the trial court recognized and entertained the motion made on January 18, 1908, to set aside the judgment of December 24, 1907, and for a new trial the judgment was *sub judice* and not final until the court, on February 8, 1908, overruled that motion. Therefore, this court has jurisdiction to review that judgment. We recognize that a motion for a new trial, in cases tried without a jury, is entirely useless so far as preserving any question for review is concerned; but that is beside the present question. We know of no rule of law prohibiting a trial judge from entertaining such motion and it is, in effect, an application for a rehearing which, when entertained, suspends the finality of the judgment already entered so that the question of the finality of the judgment is thereafter under judicial consideration.

Defendant in error contends the Southern Pacific Company is liable, as a common carrier, for the loss

of the trunk. The responsibility of a common carrier begins with the actual delivery by the owner of the property involved. A baggage check is but a receipt and as such it is not conclusive upon the carrier. M. S. & N. I. R. R. Co. v. Meyres, 21 Ill. 627; Davis v. M. S. & N. I. R. R. Co., 22 Ill. 278, 280; C., R. I. & P. R. R. Co. v. Clayton, 78 Ill. 616. "When it is once established the baggage is in the hands of the carrier to be transported to the destination of the passenger, its [the carrier's] liability as an insurer becomes fixed, in case loss should occur." C., R. I. & P. R. R. Co. v. Clayton, *supra*. The real point in controversy, upon the merits, is whether the trunk did in fact come into the possession of the carrier; although the contentiousness of counsel, upon the admissibility of evidence, has considerably obscured that question. The possession of a baggage check or receipt is only *prima facie* evidence that an article in question has actually come into the hands or control of the carrier. The carrier may rebut this *prima facie* proof; or, it may appear from the evidence adduced by a plaintiff, when considered altogether, that the check or receipt was obtained by him without the article in question actually passing into the hands of the carrier. When defendant in error closed his proof herein his evidence left the trunk in his room in the St. Francis Hotel. True, he then had a trunk check of the plaintiff in error. But the most that can reasonably be argued therefrom is that although in fact the trunk was then in Hosking's room yet, by legal construction, after he had obtained the check therefor, the possession thereof was in the Southern Pacific. Even that contention, should we agree with it, which we do not, is not sufficient to fasten responsibility upon plaintiff in error as a common carrier. Proof, however conclusive, of constructive possession in the carrier, does not satisfy the requirements of the law in such case. The burden was upon defendant in error to prove actual delivery of the trunk into the pos-

session of the carrier. Proof, as here, that it was left at a place where the carrier had a right to and might go and obtain it is not sufficient to create liability on the part of the carrier. The delivery of a trunk to a common carrier for carriage is not complete, while the trunk remains in a traveler's private dwelling, although a check or a receipt therefor may have been issued by the carrier. In Mo. Pac. Ry. v. McFadden, 154 U. S. 155, the court said: "Whilst the authorities may differ upon the point of what constitutes delivery to the carrier, the rule is nowhere questioned that when the delivery has not been made to the carrier, but, on the contrary, the evidence shows that the goods remained in the possession of the shipper or his agent after the signing and passing of the bill of lading, the carrier is not liable as carrier under the bill."

We can indulge in no presumption that the carrier, under the circumstances and conditions existing at the time in question in San Francisco, went to Hosking's room and obtained the trunk, even assuming that the Union Transfer Company was the agent of the Southern Pacific Company. White, the checking agent at the hotel, was the agent and representative of the Union Transfer Company. The Transfer Company is, evidently, a separate entity from the Southern Pacific; but its relation, either to that company or to Hosking, the record leaves considerably at large. It had the check of the Southern Pacific which it delivered to Hosking, but whether it was to transport the trunk to the depot for Hosking for hire and, although an independent concern, had the privilege of issuing the Southern Pacific's checks for baggage handled as a convenience for passengers and itself, or, whether it was an agent and representative of the Southern Pacific transporting baggage from hotels for that company, is not clearly shown. As it issued the checks of the Southern Pacific we have treated it as the representative of that road. For the reasons ap-

pearing in this opinion we find the Southern Pacific not to be liable for the trunk in question and its contents and the judgment of the Municipal Court will therefore be reversed, and judgment for the Southern Pacific will be entered here.

*Reversed.*